## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No.   24-cr-155 (TSC)** |
| **KYLE MCMAHAN** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Mr. McMahan is a 42-year-old member of the United States Military who displayed completely aberrant behavior on January 6, 2021.

He is a single father who is the primary caregiver to his two sons. Mr. McMahan lives with his two sons in Texas, where he works at the Veterans Affairs ("VA") Medical Center. He does so after serving in the Marine Corps as a decorated combat Veteran where he served two tours in Iraq.

Unfortunately, Mr. McMahan has been diagnosed with a degenerative genetic condition that has been slowly taking away his physical functioning for the past few years. There is no cure for this condition and Mr. McMahan's physical abilities will continue to deteriorate. This physical disability has completely changed his life in the past few years and has put many things into perspective for him, including his past conduct on January 6, 2021.

Mr. McMahan traveled to D.C. on January 6, 2021 with no weapons and was not part of any organized groups. He behaved inappropriately while inside the Capitol building where he did and said things he now regrets immensely, being very

1

familiar with the responsibilities of law enforcement and the stress they were under that day. As a result of his conduct, Mr. McMahan is now a felon who faces a potential dishonorable discharge from the military. With his medical condition, he stands to lose so much as a result.

Ever since January 6, 2021, Mr. McMahan has been focused on work and caring for his children. He is very remorseful for his conduct and has completely distanced himself from the events that day. Considering Mr. McMahan's unique circumstances and all of the 3553(a) factors, an alternative to incarceration is warranted in this case.

## BACKGROUND

Before January 6, 2021, former President Trump encouraged millions of ordinary Americans to travel to D.C. to attend the "Stop the Steal" rally, where he would further encourage them to go to the Capitol building to protest the certification of the Electoral College vote. The former President summoned his supporters to D.C. based on claims that the 2020 Presidential election was "stolen" from him.[1] This claim was repeated to the public over and over again, beginning immediately after the election when the former President falsely declared victory.[2] The former President led ordinary Americans like Mr. McMahan, who were not experts in election law, to believe or suspect that irregularities existed in the

---

[1] Shivaram, Deepa, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release.

[2] *Id.* at pg. 36 of final report.

election and vote count and that the purported fraud would be uncovered if people demanded action. He held rallies all over the country, repeating these claims and firing up his base of followers.

Below are examples of some of the political rhetoric that was spreading through the Trump supporter community prior to January 6, 2021, that came directly from former President Trump:

WE HAVE JUST BEGUN TO FIGHT!!!
**Tweet from Trump on December 12, 2020**.[3]

A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!
**Tweet from Trump on December 19**.[4]

The Justice Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence. They should be ashamed. History will remember. Never give up. See everyone in D.C. on January 6th.[5]
**Trump tweet from December 26, 2020**.

If you are planning to attend peaceful protests in D.C. on the 6th, I recommend wearing a body camera. The more video angles of that day the better.
**Retweet by Trump on January 3, 2021**.[6]

If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"...We're going to take it back."
**Trump's words at a rally in Georgia on January 4, 2021.**[7]

If Vice President @Mike_Pence comes through for us, we will win the

---

[3] Sherman, Amy, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Insttitute, January 11, 2021, available at
https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

Presidency. Many States want to decertify the mistake they made in
certifying incorrect and even fraudulent numbers in a process NOT
approved by their State Legislatures (which it must be). Mike can send
it back!
***Tweet from former President Trump at 1:00 am on January 6,
2021.*** [8]

Also during this time and throughout Mr. Trump's former campaign and
presidency, many military veterans all over the country were unified in their
support of him believing that Mr. Trump cared about the needs of veterans that
they felt had been ignored previously.

Mr. McMahan entered a plea in this matter to the most serious charge in the
indictment very early on in the case. He also agreed to the most serious sentencing
guideline enhancements. As a result, his guideline range is 24-30 months.

## ARGUMENT

### I.  **Legal Standard**

The Court is well aware that the Supreme Court's opinions in *Kimbrough v.
United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007),
have dramatically altered the law of federal sentencing.  While courts must
continue to consider the sentencing guidelines, Congress has required federal courts
to impose the least amount of imprisonment necessary to accomplish the purposes
of sentencing as set forth in 18 U.S.C. §3553(a). [9]  As the Supreme Court made clear

---

[8] *January 6 Report* at 61.
[9] Those factors include (a) the nature and circumstances of the offense and history and
characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory
guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for
restitution; and (f) the need for the sentence to reflect the following: the seriousness of the

in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585 (Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044 (Jan. 21, 2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*. 2009 WL 160585, at *1. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not be presumed reasonable." *Id*. At *2. In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range. Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

II.   **Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).**

   a.  **Mr. McMahan's Personal History and Characteristics**

---

offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a).

Mr. McMahan was born in Riverside, California, and lived there until he was about seven years old with his siblings and two parents. The family moved to Chula Vista, California when Mr. McMahan's father worked as a correctional officer at a state prison. His parents are still married and now live in Arizona. Mr. McMahan grew up in a strict household and he and his siblings were all expected to earn good grades in school. Because Mr. McMahan's father worked in the prison system as a correctional office for 27 years, the correctional mentality carried over while raising his boys. As such, Mr. McMahan was also raised as an Eagle Scout along with his siblings. Mr. McMahan has two brothers and a sister who sadly passed only in 2004 when she was only 20 years old. She was killed by a drunk driver.

Mr. McMahan graduated from high school in Chula Vista and attended some college but not did obtain a degree in higher education. Instead, at the age of 21, Mr. McMahan joined the Marine Corps in 2003 where he served our country on two different tours in Iraq. He married the mother of his two children in 2004, shortly after joining the military. While in the Marine Corps., Mr. McMahan earned several awards and medals, including the Good Conduct Medal, the Combat Action Ribbon, and the National Defense Service Medal. Mr. McMahan was honorably released from active duty and the Marine Corps in 2007.

After his military service, Mr. McMahan went on to work a couple different odd jobs until he became a federal firefighter in Hawaii from 2012 – 2018. Mr. McMahan also became a Staff Sergeant in the Air Force Reserves in 2015. He left his work as a firefighter to work at the VA medical center in Texas as an ER

technician. Mr. McMahan has lived in Texas ever since where he raised two boys who are now 18 and 17 years old.

Unfortunately, Mr. McMahan's marriage fell apart in early 2021 when his ex-wife left him for another man. However, both parties agreed that Mr. McMahan was in the best position to be the primary caregiver to their two sons. Mr. McMahan has been a single father ever since and has enjoyed and cherished raising his sons.



While still serving in active duty in the military, Mr. McMahan began to notice that he oddly could not physically keep up with his responsibilities anymore. He could not run as long during trainings and his overall performance declined. At the time, he did not know that this was the beginning of a disease he would later be diagnosed with that was degenerative and incurable.

Years later, in 2022, Mr. McMahan finally went to the doctor to find out why he could not function properly anymore. It turns out that he had a genetic condition called hereditary spastic paraplegia, which is an inherited disorder that causes weakness and stiffness in the legs and muscles. *See* PSR Par. 70. Mr. McMahan learned that his symptoms would get worse over time, which they have. He now walks with a distinct limp and cannot exert himself physically the way that he used to be able to do. Over time, his physical functioning will slowly degenerate and he may need the assistance of a wheelchair. He could also risk more serious complications such as epilepsy, cognitive impairment, and deafness.[10]

This disease is the reason Mr. McMahan left his work as a federal fire fighter and is now doing non-manual work while still serving his country at the VA medical center in Texas. He is still working full-time and caring for his two children and is still part of the Air Force Reserves.

### b.  Nature and Circumstances of the Offense

On January 6, 2021, Mr. McMahan was not part of any organized groups. He did not come with any weapons but rather had a red "Make America Great Again" hat on most of the time he was on the grounds and inside the Capitol building. Mr. McMahan did not have prior nefarious intentions and made the decision to go to D.C. just a few days before when he was on Facebook and noticed other Trump supporters would be going. So he hitched a ride with a couple he met on one of these chat groups and they drove to D.C. arriving on January 5, 2021.

---

[10] https://www.ninds.nih.gov/health-information/disorders/hereditary-spastic-paraplegia

Men like Mr. McMahan were not only pawns of the Trump campaign, but more organized groups on January 6, 2021, like the Proud Boys, who also intended to rile up normal people in the crowd to serve their agenda. The New York Times investigated this dynamic and learned that there were different groups who went to the Capitol building, ones that simply intended to protest peacefully and others with a plan to incite the crowd and breach the building.[11] The Proud Boys called people like Mr. McMahan "normies" and had an intent to rile them up in order to support their agenda.[12] Mr. McMahan went to D.C. naively being completely unaware of the powers at be that had paved the way for the perfect storm of January 6. He was used to serve a purpose and is now a felon because of it. In the sentencing of Andrew Cavanaugh, the court opined that perhaps some January 6 defendants are victims too and were ordinary Americans with no criminal history who were subject to the "power of being told lies over and over again by leaders who knew better." *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-27.

Now that Mr. McMahan has had time to reflect, he deeply regrets his behavior. In fact, when asked by government counsel at a recent de-brief if he was

---

[11] New York Times, Proud Boys Led Major Breaches on Jan. 6 Video, July 11, 2022, available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html (last viewed on April 7, 2023).

[12] Reneau, Natalie, New York Times, How the Proud Boys Breached the Capitol on Jan. 6: Rile up the Normies, June 17, 2022, available at https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-proud-boys-breached-the-capitol.html

remorseful, Mr. McMahan replied, "I am very remorseful for what I did. The police were just doing their jobs…the way I acted was not how I was raised."

While Mr. McMahan has pled guilty to assaulting an officer, he did not go to the Capitol building seeking to harm officers. While he did make physical contact with law enforcement, the contact was minimal. Mr. McMahan acknowledges that officers had every right to physically engage with rioters and to push them out and he unfortunately became defensive when it occurred – which led to him swatting officers' hands away when being pushed out (justifiably) by them. However, it was apparent that Mr. McMahan's intentions were not to be violent that day. For example, while inside the Rotunda, Mr. McMahan attempted to break up a scuffle between rioters and police at a moment where rioters were getting very aggressive with law enforcement.



Going back to Mr. McMahan's initial arrival at the Capitol Grounds, he was joined by thousands of people on the East Perimeter who were all behind barricades

holding up signs that they had brought from Trump's speech/rally. So, Mr. McMahan did not see and was not aware of the chaos that was occurring on the west side of the grounds at the time. In the same crowd on the east side, Mr. McMahan was alongside what appeared to be ordinary men and women (not wearing riot gear), young and old, from all walks of life. At the front of the barricades, there were a just a couple of unruly individuals who eventually broke the barricade line, which allowed the crowd to move forward. Mr. McMahan was not one of those individuals. At the time this occurred, Mr. McMahan was further back in the crowd. So while the statement of offense indicates that Mr. McMahan moved a barricade to side, this is referring to when the barricades were already breached, the crowd had already moved forward, and Mr. McMahan grabbed it to get it out of the way as hundreds of people were moving forward.



Mr. McMahan then followed the large crowd up the East Steps towards the East Entrance. By the time he arrived at the East Rotunda Doors he was

sandwiched between hundreds of people behind him pushing forward and police at the doors pushing people back. While Mr. McMahan did make physical contact with an officer at this point, he was simultaneously being pushed from behind. When an officer pushed him back, he complied and fell further back in the crowd not gaining entrance at that point. When Mr. McMahan finally did enter the Capitol building, there were already hundreds of people in front of him and behind him.



Mr. McMahan then followed everyone into the Rotunda where people were taking photographs and videos and waiving around American flags. After the Rotunda being relatively calm for a while, people started shouting and encouraging the crowd to move towards one of the entrances in the Rotunda. Mr. McMahan was seen using his hands to gesture forward but did not say anything to others directing them to be violent in any way but said "Move up!" It is right after that point that Mr. McMahan inserted himself in between a group of unruly people and the police

and encouraged them not to be violent as described and displayed above. In the mix of all of this, Mr. McMahan did swat away the hand of an officer trying to push them all back.

As police officers were successful in pushing the crowd back and out of the Rotunda, tensions were high between officers and rioters. Mr. McMahan while packed into the crowd like sardines tried to verbally defend a rioter who was being pushed by an officer. However, Mr. McMahan did not push the officer and while being packed into the crowd but rather placed his hand on the arm of the officer not in an aggressive manner.

Lastly, while Mr. McMahan was being pushed out of doors of the Rotunda foyer entrance, unfortunately there was another surge of rioters entering the Rotunda which forced him further back in. This surge is how he ended up to the far left side where he had one more confrontation with an officer where he again slapped his hand away in response to being pushed. Shortly after, he left the building with no incident.



Mr. McMahan's conduct on January 6, 2021, was very uncharacteristic of how he has conducted himself 40 years prior to those few hours in his life. Nobody close to him would ever describe Mr. McMahan as a violent individual and nothing in his past would ever indicate so.

Since Mr. McMahan's case has been pending, he has been compliant on pre-trial release, has been focusing on his employment and living a simple life and taking care of his two sons. Many friends, family, and co-workers, have shown their support of Mr. McMahan despite his conduct. One of his son's Boy Scout leaders wrote a letter describing how great of a father Mr. McMahan is and how he has seen "him work long hours to support his family." *See* Exhibit 1 Letter from Paul Thrower. Mr. McMahan's supervisor also wrote a letter saying that "Kyle excelled in all his endeavors at the Dallas VAMC…and has served our Veterans with integrity, humility, honor, and a relentless work ethic." *See* Exhibit 2 Letter from Supervisor. An attending physician at the VAMC that Mr. McMahan works with says he is "very much respected and endeared to the Physician and Nursing staff as a whole." *See* Exhibit 3, Letter from Dr. Ivanovskis. Ms. Byrd also attests to this as an RN who works with Mr. McMahan saying he is "always patient and kind to the Veterans, treating them with the utmost respect." *See* Exhibit 4, Letter from Ms. Byrd.

Mr. McMahan's son, who is only 18 years old, took the time to write a thoughtful letter to the Court where he describes his father's dedication to him and his younger sibling. *See* Exhibit 5, Letter from Malachai McMahan. What is most

14

notable about his son's letter is how he tells us that Mr. McMahan expressed regret for his actions to his son and how he explained that his actions have consequences. *Id*. This shows that Mr. McMahan is not hiding behind what he did but is confronting it head on and making sure his son knows what he did and how wrong it was so that his son does not repeat the same mistakes.

Mr. McMahan also expressed regret for his actions to another fellow Boy Scout father, Mark Anderson. *See* Exhibit 6, Letter from Mark Anderson. Mr. Anderson explains how Mr. McMahan is a "kind man and his boys need him to present in their lives." *Id*.

From the very beginning of the investigation into his conduct on January 6, 2021, Mr. McMahan has been cooperative and has not tried to obstruct law enforcement. He accepted responsibility very early on in this case and is ready to face the consequences for his actions.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on the past three years, the Court can be assured that Mr. McMahan will not repeat the same conduct. Firstly, Mr. McMahan's compliance on pre-trial supervision has been perfect. Second, in the past 3 years since his offense conduct he has shown that his focus is solely on work and maintaining stability. He is not focused on politics and will not fall into the dangerous mentality that led to his conduct ever again. Furthermore, he has no criminal history and it is clear that this

prosecution alone, including now being a felon, has sufficiently deterred him from future misconduct.

Lastly, given his military status in the Reserves, Mr. McMahan's potential collateral consequences he will face as a result of this conviction and potential sentence of incarceration are severe. Firstly, he will likely lose the opportunity to be honorably discharged. Second, this conviction could affect his application for disability benefits that he has been trying to navigate given the pending case and given his deteriorating medical condition. Courts have recognized that collateral consequences are forms of punishment that should be taken into account when fashioning an appropriate sentence:

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.
>
> *United States v. Andrew  Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 29.

Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of similar and more aggravating conduct further demonstrates that a significant variance is warranted in the instant case.[13]

---

[13] This analysis in no way suggests that the sentences imposed were appropriate and are simply based on what was provided on the public docket regarding government allegations and defendant admissions.

• *US v. Grayson Sherrill*, 21-cr-282 (TSC): Mr. Sherrill was sentenced to 7 months' incarceration despite the guideline range of 37– 46 months. He entered a plea to 18 U.S.C. § 111(a) after admitting to swinging a metal pole at a police officer. He was only 21 years old at the time of the offense conduct and had no criminal history like Mr. McMahan. While Mr. Sherrill was much younger than Mr. McMahan, the other unique mitigating circumstances about him described above warrant a similar significant variance below the lower guideline range in this case.

• *US v. Devin McNulty*, 23-cr-235 (TSC): Mr. McMahan's case is not like the McNulty matter where this Court sentenced him to 12 months' and 1 day of incarceration after he pled guilty to assaulting an officer and had a guideline range of 24-30 months. McNulty climbed a retaining wall to reach the Upper West Terrace of the Capitol and joined a mob trying to breach the building. During this attempted breach, McNulty tried to wrestle away a shield from an officer. Mr. McNulty had a difficult childhood and no criminal history. However, Mr. McMahan should receive a greater variant sentence given the vast differences in their offense conduct and his medical issues and service to this country.

• *US v. Joseph Leyden*, 22-cr-314 (TNM): Mr. Leyden pled guilty to one count of 18 U.S.C. §111(a) and admitted to pushing a police officer on the Capitol grounds. He was one of the first rioters to breach the Capitol grounds when police were trying to reestablish police lines. Mr. Leyden

was sentenced to 6 months' incarceration despite the government's request for 27 months' incarceration. Mr. Leyden also faced daunting medical conditions (although not as severe as Mr. McMahan's) and had no criminal history.

• *US v. Mark Leffingwell*, 21-cr-005 (ABJ): Mr. Leffingwell received a sentence of 6 months' incarceration after entering a guilty plea to 18 U.S.C. §111(a) despite the government's request for 27 months' incarceration. Mr. Leffingwell admitted to throwing two punches at police officers but also had a lot of mitigation. He was a former veteran who suffered a traumatic brain injury. Similarly, Mr. McMahan suffers from a disability that has greatly impacted his life and served our country for several years.

• *US v. Kaleb Dillard,* 23-cr-049 (JMC): Mr. Dillard's conduct was far more aggravating than Mr. McMahan's conduct. Mr. Dillard was convicted of one count of 18 U.S.C. §111(a) after admitting that he smashed a window at the East Rotunda Doors and pushed a police officer to the ground. Mr. Dillard received a sentence of 10 months' incarceration.

• *US v. James McNamara*, 23-cr-119 (ABJ): Mr. McNamara also pled guilty to one count of 18 U.S.C. §111(a). Mr. McNamara was sentenced to 12 months' incarceration, a variance below the guideline range of 24-30 months. Mr. McNamara allegedly swung at a police officer with a *closed*

18

*fist* and grabbed a metal barricade and slammed it into an area the police
were trying to secure.

Furthermore, while Mr. McMahan was not convicted of Civil Disorder, it is
worthwhile to consider the sentences imposed in cases where defendants were
convicted of Civil Disorder because while the sentencing guidelines are
substantially lower in those cases, the overall conduct in those some of those
matters involves "assaultive" conduct even though they were not ultimately
convicted of assault.

- *US v. James Davis*, 21-cr-595 (TJK): Mr. Davis was initially charged with
  assaulting a police officer but was offered a plea to Civil Disorder, similar to
  what counsel attempted to do in this matter but was unsuccessful.
  Interestingly, Mr. Davis essentially admitted to assaulting officers. He was a
  member of the Proud Boys and was involved in the Lower West Terrace
  chaos. He admitted to pushing against a police officer's riot shield while
  holding a long wooden stick in his other hand. Police officers had to push him
  away using a baton after attempts to push forward. The Court sentenced him
  to 2 months' incarceration. Mr. Davis was also a former Marine and struggled
  with his physical health as a result.

- *US v. David Blair,* 21-cr-186 (CRC): Mr. Blair was sentenced to 5 months'
  incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Blair was
  accused of bringing tactical gloves, carrying a lacrosse stick with a large
  Confederate flag attached to it and using that stick to push against a police

officer's chest. The government also alleged he carried a backpack with a knife and roll of duct tape inside.  Mr. Blair never made it inside the Capitol building because he was detained on the spot after allegedly assaulting officers with his stick.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Mr. Johnson was sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson allegedly pushed against a line of officers who were guarding the East Rotunda doors trying to prevent rioters from gaining entry to the building. The pushing of rioters caused these officers to be sandwiched against the doors and the effort of the rioters were successful as that door was breached. Mr. Johnson also allegedly said afterwards that he was trying to find a way into the Senate Chamber.

- *US v. Robert Fairchild*, 21-cr-551 (TFH): Mr. Fairchild was sentenced to 6 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Fairchild admitted to engaging with officers to try to break through the metal barriers making contact with law enforcement with his back and shoulders as he tried to tussle with the barriers to breach the area.

Lastly, there are courts that have imposed sentences that did not involve incarceration when there were unique circumstances present.

- *US v. Rafael Rondon*, 21-cr-722 (JMC): The Court imposed 60 months' probation with the condition that Mr. Rondon serve 18 of those months on home detention after he entered a plea to 18 U.S.C. § 1512(c)(2). Mr. Rondon

also suffered from a debilitating injury where he had to undergo extensive surgeries and rehabilitation. He was also very young when he entered the Capitol building with his mother.

- *US v. William Isaacs*, 21-cr-028 (APM): After a long jury trial in the Oathkeepers case, the jury convicted Mr. Isaacs of several felony counts, including 18 U.S.C. § 1512(c)(2). However Mr. Isaacs did not engage in any violence and was only 21 years old at the time of his conduct. Most notably, he suffered from Autism Spectrum Disorder. Due to all of these factors, the court sentenced him to 60 months' probation despite being convicted of several serious felony counts after a jury trial.

### General Deterrence

Sentencing Mr. McMahan to a significant period of incarceration is not the way to ensure that the isolated events on January 6 will never occur again. Empirical evidence proves that the certainty of prosecution, rather than the severity of the punishment is the greater deterrent.[14] Individuals like Mr. McMahan who have no criminal history and who have a history of military service have already been deterred by this threat of prosecution. Most individuals involved in January 6, 2021, were encouraged to do what they did by the most powerful executive in our country and yet the government has not hesitated to prosecute these individuals to the fullest extent possible. Individuals like Mr. McMahan, who

---

[14] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

are not activists, would be deterred just by the prospect of such a harsh prosecution and the collateral consequences that result from a felony conviction. For these reasons, the goal of general deterrence would be more than met by a variant sentence.

### d. Aberrant Behavior and Military Service

Unfortunately, Mr. McMahan's plea agreement prohibits him from requesting departures from the guidelines, however there are available departures for aberrant behavior and exceptional military service that warrant a variance for the same reasons.

Firstly, just like U.S.S.G. § 5K2.20 (b)(3) normally allows a departure based on a defendant's "marked deviation from an otherwise law-abiding life," Mr. McMahan deserves a variance for the same reason. He does not have a criminal history, the offense was committed without significant planning, and the offense was of limited duration. As discussed above, Mr. McMahan lived a life full of service and care for his family. He had no sophisticated planning on January 6, 2021, and had a short-lived lapse in judgment that has already cost him so much. For these reasons, Mr. McMahan requests that the Court consider his aberrant behavior and to impose a variant sentence.

Lastly, the sentencing guidelines normally allow for a departure for exceptional military service/career under U.S.S.G. § 5H1.11. For the same reasons, however, a variance for Mr. McMahan's outstanding military service and career is warranted. Mr. McMahan not only served in two Iraq tours, obtaining several

medals and accommodations, he also served as a firefighter for several years afterwards. Now, he is still serving our country by treating wounded Veterans. The combination of all these valuable services he has provided in his life takes this case out of heartland of cases and warrants a significant variance.

## CONCLUSION

For the reasons stated above, Mr. McMahan respectfully requests that the Court grant a significant variance based on the factors outlined in 3553(a) and to consider a sentence of non-incarceration given the mitigating health circumstances Mr. McMahan has and will continue to face.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org