**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-155-TSC** |
| **KYLE DOUGLAS MCMAHAN,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kyle Douglas McMahan to 30 months of incarceration, 36 months of supervised release, 200 hours of community service, $2,000 restitution, and the mandatory assessment of $100. The government's recommended term of incarceration is the top of the applicable 24–30 month guidelines range calculated by the United States Probation Office and the parties.

**I.     INTRODUCTION**

The defendant, Kyle McMahan, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

McMahan, once a sergeant in the United States Marine Corps, was among the first rioters who breached the east perimeter of the U.S. Capitol's restricted area. Soon after rioters broke through the bike-rack barriers on the east front, McMahan moved one of the barriers out of the way, making it easier for rioters to stream toward the U.S. Capitol building. Along with the rioters, McMahan ascended the eastern steps where police had formed a makeshift line. McMahan put himself at the front line of rioters confronting the police when this line was breached. McMahan next joined the mob of rioters gathered outside the east Rotunda doors confronting a small group of outnumbered police. While among this mob, McMahan moved towards the Rotunda doors in an effort to get inside the building. When Sergeant D.V.B. resisted McMahan's efforts, McMahan pushed Sergeant D.V.B. Once inside the building, McMahan physically confronted police several times, frequently engaging in assaultive conduct. Through his violent actions, McMahan not only encouraged other rioters to engage in violence, but also interfered with police efforts to expel other rioters. All of McMahan's violence was intended to interrupt our nation's peaceful transfer of power.

The government recommends that the Court sentence McMahan to 30 months of incarceration for violating 18 U.S.C. § 111(a)(1). A 30-month sentence reflects the gravity of McMahan's conduct, his lack of remorse, and the need for both general and specific deterrence.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 24, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters who sought to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.      McMahan's Role in the January 6, 2021, Attack on the Capitol

McMahan traveled with three companions by car from Texas to Washington, D.C., arriving on January 5, 2021. The next day, he approached the rally near the Ellipse, but was unwilling to comply with security measures that would have required him to abandon his backpack. In that backpack, McMahan carried items that reflected McMahan's anticipation of violence: first aid supplies, a gas mask, and a helmet.

Instead of attending the rally near the Ellipse, McMahan went to the Capitol building. He arrived at approximately 10:00 a.m. Eventually, he joined a group gathered at the bike-rack barriers on the east side of the restricted area of the U.S. Capitol grounds. By approximately 2:00 p.m., groups of rioters on the east side began to confront officers in an attempt to breach the police line. McMahan watched as several rioters started pushing the barriers against the officers defending the restricted area, while other rioters shouted, "Go! Go! Go! Take it!" Amidst the yelling and violence, McMahan saw rioters pull the barriers away from the officers who were trying to keep the perimeter in place. As the mob pushed past police officers and toward the east steps of the U.S. Capitol building, McMahan joined in. At around 2:00 p.m., McMahan entered the restricted area, grabbing one of the remaining bike-rack barriers and removing the obstacle to make it easier for the rioters to get to the Capitol.



*Image 1: McMahan moving barrier, from Gov. Ex. 1 at 03:02.*

McMahan advanced toward the building, and he joined the rioters who had gathered on the east steps leading to the U.S. Capitol building. Members of the U.S. Capitol Police (USCP) attempted to form another police line on the east steps in an effort to prevent the rioters from advancing further. McMahan put himself at the front line of the rioters, and he joined the crowd in pressing against the police line.



*Image 2: McMahan at police line, Gov. Ex. 1.1.*

McMahan joined other rioters as they surged and pushed against the officers. The mob eventually overwhelmed the police line, and McMahan joined the rioters surging past police officers and up the east steps. At the top of the steps, McMahan turned back toward the mob of rioters behind him and celebrated the rioters' success by pumping his fists in the air triumphantly.



*Image 3: McMahan pumping fist in air, from Gov. Ex. 2 at 01:25.*

Once on the landing just outside the east Rotunda doors, at around 2:15 p.m., McMahan looked on as rioters attempted to force their way into the U.S. Capitol, fighting with the vastly outnumbered police who had retreated to the Rotunda doors. The rioters shoved the officers, hurled objects at them, sprayed them with chemical irritants, ripped their shields away, and attacked them with makeshift weapons. One of these officers was D.V.B., at that time a USCP sergeant. During the melee, McMahan pushed against Sergeant D.V.B. as part of his effort to get to the Rotunda doors. When Sergeant D.V.B. forced McMahan back, McMahan retaliated by pushing Sergeant D.V.B. forcefully. McMahan leaned his upper body into Sergeant D.V.B. and brought himself face-to-face with the officer, appearing to shout as he pushed.



*Image 4: McMahan (yellow) pushing Sgt. D.V.B. (blue), from Gov. Ex. 3 at 00:29.*

For around half an hour, McMahan remained at the front of the angry mob as they confronted police and tried to get into the building. During this time, McMahan was exposed to chemical irritants, but McMahan was undeterred—McMahan flushed his eyes with water and returned to the confrontation. At around 2:41 p.m., after rioters forced open the doors to the

Capitol, McMahan entered the building with the mob. Another rioter near McMahan shouted, "Let's find Pelosi!" Gov. Ex. 5.



*Images 5, 6, 7: McMahan outside Rotunda doors, from Gov. Ex. 4 at 09:26, 13:56, and 15:07.*

After entering, McMahan went straight into the Rotunda, pumping his fists in the air in celebration while chanting with his fellow rioters ("Whose house? Our house!"). He exchanged hugs, fist bumps, and jubilant high fives with other rioters.



*Images 8, 9, 10: McMahan celebrating, from Gov. Ex. 4 at 33:24, 33:33, and 33:52.*

While in the Rotunda, McMahan witnessed other rioters calling for people to head toward the Senate Chamber, including one who shouted, "You want a fight? There it is!" Gov. Ex. 4, 35:56. McMahan then joined a group of rioters who left the Rotunda and advanced further into the Capitol building toward the Old Senate Chamber.



*Image 11: McMahan gesturing toward Senate Chamber, from Gov. Ex. 6 at 00:13.*

McMahan moved toward the Senate Chamber and made it as far as the hallway outside the Old Senate Chamber, where a line of police officers halted the rioters' advance. McMahan watched as rioters pushed against the police line while officers defended the building, deploying chemical irritants in an effort to get the rioters to leave. Gov. Ex. 7. McMahan implored other rioters to gather similar weapons to be wielded against the police, shouting, "We need shields and spray!" Gov. Ex. 8. Eventually, McMahan retreated from the area altogether, returning to the Rotunda at around 2:51 p.m.



*Image 12: McMahan near Old Senate Chamber, from Gov. Ex. 7.1.*

At around 2:54 p.m., McMahan was talking to other rioters at the center of the Rotunda, when he noticed police gathering at the west entrance to the Rotunda, in preparation for their effort to remove rioters from the area. McMahan gestured for other rioters to move toward the police to prevent them from entering. Gov. Ex. 9, 01:13. McMahan personally approached MPD Officer M.L. who was a part of the police line. Despite having seen repeated acts of violence by the mob against officers and having encouraged rioters to get "shields and spray" to use against the officers, McMahan told Officer M.L., "Listen. We don't want to hurt any of you." Gov. Ex. 10, 00:26.

Seconds later, when a different officer became distracted by a rioter, McMahan advanced toward the distracted officer. Officer M.L. intercepted McMahan, and McMahan grabbed Officer M.L.'s right hand. Officer M.L. had to wrest his hand from McMahan's grip. Though brief, McMahan's physical contact was nevertheless part of his effort to interfere with the police who were fulfilling their lawful duty to prevent the rioters from advancing further into the Capitol building.



*Image 13: McMahan with hands outstretched toward officers, from Gov. Ex. 10 at 00:55.*



*Image 14: McMahan gripping Ofc. M.L.'s hand, from Gov. Ex. 10 at 00:57.*



*Image 15: McMahan gripping Ofc. M.L.'s hand, from Gov. Ex. 11 at 00:55.*

Despite his skirmish with Officer M.L., McMahan did not retreat. Gov. Ex. 12. Instead, moments later, McMahan joined rioters collectively pushing against the police line. Gov. Ex. 13. McMahan assisted his fellow rioters by pushing a rioter in front of him toward the police, adding his strength to the rest of the mob. McMahan disengaged from the collective push only after the police deployed chemical irritants.



*Image 16: McMahan pushing rioter, from Gov. Ex. 13 at 00:05.*

Although McMahan had disengaged from the collective assault on the police, other rioters pressed forward and a dangerous situation unfolded. One rioter wrapped their arm around MPD Officer M.B. and pushed her, causing her to fall down a set of marble stairs and hit her head. Gov. Ex. 14.[2]

After the fight at the west entrance, McMahan moved to the south entrance to the Rotunda and tried to the enter the passage leading to Statuary Hall. Gov. Ex. 15. Continuing to understand that the rioters' power was in their numbers, he gestured for other rioters to join him there. Police at that location stopped McMahan's progress, but he was not deterred. McMahan moved toward one of the officers and pushed his arm. When another officer tried to move McMahan back, McMahan knocked the officer's arm away with his forearm, once again making physical contact, and resisting the officer's attempt to maintain order.



*Images 17, 18: McMahan pushing and resisting officers, from Gov. Ex. 15 at 00:23, 00:44.*

Between around 3:00 and 3:20 p.m., police formed a line around McMahan and the other rioters who remained in the Rotunda and began moving them toward the eastern entrance to the

---

[2] While McMahan did not directly assault Officer M.B. and her injury was not necessarily a foreseeable consequence of his actions, his repeated confrontation of officers as part of a violent mob helped create the dangerous environment in which that assault and injury took place.

Rotunda. MPD Officer S.M. was among the officers trying to regain control of the Rotunda. At around 3:18 p.m., as Officer S.M. tried to expel another rioter, McMahan grabbed Officer S.M.'s arm. Officer S.M. shouted, "Get off me! Get off me!" and McMahan replied by threatening the officer: "Don't fucking touch him! Don't fucking touch him!" Gov. Ex. 16, 00:16.



*Images 19, 20: McMahan's hand on Ofc. S.M., from Gov. Ex. 16 at 00:16, 00:18.*

By around 3:20 p.m., McMahan had been forced out of the Rotunda and into the vestibule between the Rotunda and the Rotunda doors. At that time, rioters were streaming into the building through the Rotunda doors and officers were trying to stop them. McMahan interfered with the police efforts by pulling USCP Officer M.H. away from the incoming rioters, impeding his response to the threat of incoming rioters.



*Image 21: McMahan pulls Ofc. M.H., from Gov. Ex. 17 at 00:26.*

Instead of leaving as he had been directed, McMahan turned away from the doors and tried to move further into the building. USCP Officer C.A. placed his hand on McMahan's chest in an effort to stop him. McMahan slapped away Officer C.A.'s hand, but Officer C.A. successfully stopped McMahan from advancing further into the building.



*Image 22: McMahan slaps hand of Ofc. C.A., from Gov. Ex. 17 at 00:42.*

As officers began expelling rioters from the building through the Rotunda doors, McMahan confronted yet another officer, calling him a "traitor."



*Image 23: McMahan calls USCP officer a "traitor," from Gov. Ex. 18 at 00:00.*

McMahan left the building through the Rotunda doors at around 3:35 p.m. Even after he left the building, he remained on restricted grounds. McMahan lingered outside the doors as police ushered other rioters out of the building. By his own admission, McMahan remained on the Capitol grounds until around 6:30 p.m. By this time, he was wearing a Kevlar helmet that he had brought to the riot.



*Image 24: McMahan parading on Capitol grounds with helmet, from Gov. Ex. 19.*

### C. McMahan's Conduct After January 6, 2021

McMahan was proud of his conduct on January 6 and believed his actions were justified. Despite having sworn a military oath, McMahan contemplated quitting his position because he was not happy with how the election had turned out. He searched Google asking: "can I resign from the military if I do not want to serve an illegitimate president?"

> Searched for <u>can i resign from the military if i do not want to serve an illegitimate new president?</u>
> Jan 8, 2021, 9:43:31 PM UTC

Moreover, on social media, McMahan openly celebrated his participation in the riot, characterizing himself and the other rioters who assaulted American democracy as "patriots."



*Image 25: McMahan's messages on Facebook.*

### D. McMahan's August 19, 2024, Post-Plea Debrief

McMahan agreed to be interviewed by law enforcement on August 19, 2024. While McMahan expressed regret over the riot, he did not demonstrate any remorse or understanding for why his conduct on January 6 was wrong. At most, McMahan grudgingly agreed that the police did not deserve to be attacked that day because they were "doing their job." When asked if he would engage in similar conduct in the future, McMahan could only say that he did not "plan" to.

### III.     THE CHARGES AND PLEA AGREEMENT

On March 27, 2024, a federal grand jury returned an indictment charging McMahan with seven counts, including assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1) (Count One). On June 28, 2024, McMahan entered a plea of guilty as to Count One pursuant to a plea agreement.

### IV.     STATUTORY PENALTIES

McMahan now faces sentencing for violating 18 U.S.C. § 111(a)(1) (Count One). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 51. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 17, McMahan's Guidelines imprisonment range is 24 to 30 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

### VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

A.     **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, McMahan's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. McMahan consistently sought police lines during the attack on the U.S. Capitol. McMahan assaulted USCP Lt. D.V.B. when McMahan was trying to get into the building. McMahan engaged in assaultive or physical contact against police on at least seven separate occasions. The nature and circumstances of McMahan's offenses were of the utmost seriousness, and fully support the government's recommended sentence.

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But nothing in this defendant's Guideline calculation reflects the fact that his goal was to prevent the peaceful transfer of power. McMahan would face the same offense level if his crime had not endangered the democratic process. There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. Accordingly, a sentence at the high end of the defendant's Guidelines range is necessary to "reflect the seriousness of the offense," "promote

respect for the law," and "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

**B. The History and Characteristics of the Defendant**

McMahan is a 42-year-old veteran and former sergeant in the United States Marine Corps. PSR ¶ 78. According to the PSR, his rank is Staff Sergeant in the United States Air Force Reserves, which he joined in 2015. PSR ¶ 78. McMahan currently works as an Intermediate Care Technician in the emergency room at the Dallas Veteran Affairs Medical Center. PSR ¶ 85. He is divorced with two children ages 17 and 18. PSR ¶ 62. According to the PSR, McMahan does not have the ability to pay a fine. PSR ¶ 100.

Unlike many defendants whose circumstances constrain their choices and opportunities, McMahan had a stable childhood, a close family, good education, no drug abuse, no mental health problems, and a promising military career. PSR ¶¶ 56–90. There is nothing in his background that explains or mitigates his decision to assault officers at the U.S. Capitol in an effort to prevent the peaceful transfer of power on January 6, 2021. It is also worth noting that McMahan was not fully forthcoming in the presentence investigation. When asked about leaving his job as a correctional officer in 2009, his first instinct was to lie about what happened and omit that he was fired for selling tobacco to the inmates under his watch. PSR ¶ 90. His lie and his willingness to exploit prison inmates speak to his bad character and lack of respect for the law. McMahan also did not provide a complete financial statement, showing a lack of respect for the court.

McMahan's military service should not mitigate his sentence. He is a decorated veteran whose conduct on January 6, 2021, directly violates the oath he took to support and defend the Constitution of the United States against all enemies, foreign and domestic. The fact that he considered quitting the military just because he disagreed with the outcome of the 2020 presidential election shows that he elevated his political preferences over his duty to our country.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. McMahan's criminal conduct on January 6 was the epitome of disrespect for the law. As a judge from this district has expressed, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. McMahan's expressions of remorse and contrition stand in contrast to the boastful nature of his post-January 6 comments—they should be given little weight. *See United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

McMahan characterized the rioters as "patriots" and he bragged about pushing his way into the U.S. Capitol. He did not feel bad about assaulting police officers or interrupting the peaceful transfer of power. To the contrary, he was proud of his actions and boasted about his conduct. Moreover, his expressions of regret—suggesting that police had a job to do—fall woefully short of demonstrating the sort of contrition that would merit consideration at sentencing. He feels sorry now that he is facing the consequences of his actions, but he did not feel sorry when he bragged about attacking the Capitol and the officers defending it.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]  "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Kevin Galetto*, 21-cr-517-CKK, Judge Kollar-Kotelly sentenced a defendant to two concurrent terms of 27 months of incarceration and 24 months of supervised release. That defendant pleaded guilty to violating 18 U.S.C. § 231(a)(3) (civil disorder) and 18 U.S.C. § 111(a)(1) (assaulting certain officers). In that case, the defendant pushed against officer shields in the Lower West Terrace tunnel. After the defendant retreated from the tunnel, he shouted to the crowd outside, "More people!" He was at the tunnel for over an hour and half. Compared with Galetto, McMahan also pushed against an officer under similar circumstances. McMahan was part of a group of rioters who collectively attempted to overwhelm police guarding an entrance to the Capitol. And unlike the rioters at the tunnel, McMahan succeeded in entering the Capitol.

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

McMahan was also present inside the Capitol for nearly an hour, confronting police, collectively pushing against officers, and calling for other rioters to join his efforts.

In *United States v. Clifford Mackrell*, 21-cr-276-CKK, Judge Kollar-Kotelly sentenced a defendant to 27 months of incarceration and 24 months of supervised release. That defendant pleaded guilty to violating 18 U.S.C. § 111(a)(1) (assaulting certain officers). In that case, the defendant was outside the Capitol building at the west front when he struck an officer and pulled down their gas mask. The defendant also shoved a piece of plywood into a police line and pushed the officers on that line. Compared with Mackrell, McMahan also engaged in multiple acts of assaultive conduct and repeatedly confronted the police. Unlike Mackrell, McMahan was engaged in the conflict for a longer period and he ventured inside the Capitol building where he sought out the front lines and further confrontation with police.

In *United States v. Cale Clayton*, 22-cr-139-RCL, Judge Lamberth sentenced a defendant to concurrent terms of 30 months of incarceration, 24 months of supervised release, and $2,000 restitution, based on his conviction on two counts of violating 18 U.S.C. § 111(a)(1). The defendant engaged in two assaultive acts in the Upper West Terrace: (1) at around 4:23 p.m. he forcibly grabbed a shield held by a police officer, and (2) five minutes later he forcibly made contact with an officer by grabbing the face shield of his helmet and pushing the officer backward. Compared with Clayton, McMahan engaged in more acts of assault, interference, and physical contact against police officers during the hour he spent inside the U.S. Capitol. McMahan can be seen in the footage encouraging other rioters to do the same and directing them to take action. He also engaged in collective efforts to break police lines—his efforts enabled other rioters to seriously injure at least one other officer.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, D.V.B., did not suffer bodily injury as a result of McMahan's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that McMahan must pay $2,000 in restitution, which reflects in part the role he played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) McMahan's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 123.

## VIII.   FINE

The defendant's conviction for a violation of 18 U.S.C. § 111(a)(1) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, while the PSR concludes that McMahan is not likely to be able to pay a fine, the government notes that McMahan has failed to provide the full financial disclosure requested by Probation. *See* PSR ¶ 91.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months of incarceration, 36 months of supervised release, 200 hours of community service, $2,000 restitution, and the mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Carlos A. Valdivia*
Carlos A. Valdivia
Assistant United States Attorney
D.C. Bar No. 1019242
601 D Street NW, Fifth Floor
Washington, D.C. 20530
E-mail: Carlos.Valdivia@usdoj.gov

Telephone: (202) 252-7508